1
2
3
4
5
6
7

8        **UNITED STATES DISTRICT COURT**

9        **EASTERN DISTRICT OF CALIFORNIA**

10

| | | |
|---|---|---|
| 11 THERESA MARIE BRASSFIELD, | ) | Case No.: 1:14-cv-01684 - JLT |
| 12              Plaintiff, | ) ) | ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT, CAROLYN COLVIN, |
| 13       v. | ) ) | ACTING COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF |
| 14 CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) | THERESA MARIE BRASSFIELD |
| 15 | ) ) | |
| 16              Defendant. | ) ) | |

17        Plaintiff Theresa Marie Brassfield asserts she is entitled to supplemental security income under

18   Title XVI of the Social Security Act.  Plaintiff argues the administrative law judge erred in evaluating

19   the record, and seeks judicial review of the decision denying her application for benefits.  Because the

20   ALJ applied the proper legal standards and the decision is supported by substantial evidence in the

21   record, the administrative decision is **AFFIRMED**.

22                                  **BACKGROUND**

23        On July 21, 2011, Plaintiff filed an application for benefits, in which she alleged disability

24   beginning June 30, 2011.  (Doc. 14-6 at 2)  The Social Security Administration denied the applications

25   at the initial level and upon reconsideration.  (*Id.*; Doc. 14-5 at 2-8)  Plaintiff requested a hearing, and

26   testified before the ALJ on July 18, 2013.  (Doc. 14-3 at 21, 43)  The ALJ determined Plaintiff was not

27   disabled under the Social Security Act, and issued an order denying benefits on August 26, 2013.  (*Id.*

28   at 22-30)  Plaintiff filed a request for review of the decision with the Appeals Council, which denied

1  the request on August 7, 2014.  (*Id.* at 5-8)  Therefore, the ALJ's determination became the final

2  decision of the Commissioner of Social Security.

3  ## STANDARD OF REVIEW

4       District courts have a limited scope of judicial review for disability claims after a decision by

5  the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact,

6  such as whether a claimant was disabled, the Court must determine whether the Commissioner's

7  decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g).  The ALJ's

8  determination that the claimant is not disabled must be upheld by the Court if the proper legal standards

9  were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health &*

10 *Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

11      Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

12 reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S.

13 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole

14 must be considered, because "[t]he court must consider both evidence that supports and evidence that

15 detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

16 ## DISABILITY BENEFITS

17      To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to

18 engage in substantial gainful activity due to a medically determinable physical or mental impairment

19 that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C.

20 § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

21      his physical or mental impairment or impairments are of such severity that he is not only
     unable to do his previous work, but cannot, considering his age, education, and work

22      experience, engage in any other kind of substantial gainful work which exists in the
     national economy, regardless of whether such work exists in the immediate area in

23      which he lives, or whether a specific job vacancy exists for him, or whether he would be
     hired if he applied for work.

24

25 42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v.*

26 *Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability,

27 the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

28 gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

**A.      Relevant Medical Evidence**

Dr. Benjamin Aleshire performed a comprehensive psychiatric evaluation on Plaintiff on May 15, 2010.  (Doc. 14-8 at 2)  Plaintiff reported that she had been "experiencing symptoms of depression [for] approximately five years."  (*Id.*)  Plaintiff said she "began suffering from physical pain and ha[d] been [in] and out of the hospital for the past five years."  (*Id.*)  Dr. Aleshire noted:

> The claimant reported her symptoms occur daily.  The claimant reported having periods of hopelessness, crying spells, and feeling overwhelmed, having low self-extreme and negative thoughts about herself.  The claimant described the severity of her symptoms as moderate, compared to when the symptoms first began they are reported as worse.  The claimant reported psychiatric medications through her primary care doctor for the past three years.  The claimant denied any suicidal ideation.

(*Id.* at 2-3)  She admitted a history of abusing methamphetamine for 20 years, stating her "last use occur[ed] in 2003."  (*Id.* at 3)  Plaintiff said she was "able to complete normal daily living activities such as showering, cleaning, washing clothing and cooking and preparing meals," but she had to "really push" because she lacked motivation to complete the tasks.  (*Id.* at 4)  She reported she did not maintain social relationships, and "some days she will spend much of her time crying and feeling hopeless."  (*Id.*)

Dr. Aleshire observed that Plaintiff "displayed no difficulty maintaining the pace of the interview."  (Doc. 14-8 at 4)  In addition, he found Plaintiff "presented as fully oriented" with "linear and logical" thought content.  (*Id.* at 4)  Plaintiff "was able to recite five digits forward but only three in reverse," and spell a word "forwards and backwards without errors."  (*Id.* at 5)  Accordingly, Dr.

1  Aleshire determined Plaintiff's "[a]ttention was moderately impaired," though her "[c]oncentration was

2  good." (*Id.*) He diagnosed Plaintiff with "Major depressive disorder, recurrent, moderate," and gave

3  Plaintiff a GAF score of 54.[1] (*Id.* at 5) Dr. Aleshire concluded Plaintiff was "able to actively perform

4  one or two step simple and repetitive tasks" and "able to adequately perform complex tasks." (*Id.* at 6)

5  Dr. Aleshire believed Plaintiff had "a moderately impaired ability to accept instructions from

6  supervisors, interact with coworkers and the public as evidenced by her tearfulness displayed during the

7  interview." (*Id.*) Further, he opined Plaintiff would be "able to deal with the usual stress encountered

8  in a competitive workplace" and "perform work activities on a consistent basis without special or

9  additional instructions." (*Id.*)

10  Dr. Sarupinder Bhangoo performed a comprehensive internal medicine evaluation on Plaintiff

11  on May 29, 2010. (Doc. 14-8 at 7) Plaintiff reported she had a "heart condition with heart murmur,

12  heart attacks, and depression as her major problems." (Doc. 14-8 at 7) Plaintiff said "that in 2002, she

13  had 2-3 heart attacks" and "underwent angiograms, though no further management was done." (*Id.*)

14  She also told Dr. Bhangoo that she had "occasional palpitations which last less than a minute," during

15  which her chest got "tight" and she had shortness of breath. (*Id.* at 8) Dr. Bhangoo observed that

16  Plaintiff was able to walk "without any difficulty" and did not appear to have "any distress." (*Id.*) Dr.

17  Bhangoo determined she had a "[g]rade 2/6 systolic murmur" in her heart. (*Id.* at 9) In addition, Dr.

18  Bhangoo found Plaintiff's lungs were clear to auscultation. (*Id.* at 8) Dr. Bhangoo concluded Plaintiff

19  was able to perform "heavy [work] with no limitations," including occasionally lifting and carrying up

20  to 100 pounds and frequently 50 pounds. (*Id.* at 10-11)

21  On June 14, 2011, Plaintiff visited the Rosedale Community Health Center for the first time in

22  two years. (*See* Doc. 14-8 at 26-32) Plaintiff told Dr. Amira Ayad that she was anxious, very

23  emotional, and depressed for a year. (*Id.* at 26) In addition, Plaintiff said she had been crying for two

24  months. (*Id.*) Dr. Ayad observed that Plaintiff's "mood [was] depressed" and she had an "anxious

25  affect." (*Id.*) However, Dr. Ayad opined Plaintiff had "appropriate judgment" and "good insight."

---

27  [1] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and
28  occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV"). A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id.* at 34.

(*Id.*) Plaintiff was diagnosed with "Generalized anxiety disorder;" "Major depressive affective disorder recurrent episode unspecified degree;" and insomnia, due to the disruption of her sleep. (*Id.*) The doctor referred Plaintiff to the psychiatry department for evaluation of her depression. (*Id.*)

Colleen Overholt, LFMT, completed the initial intake appointment with Plaintiff on June 16, 2011. (Doc. 14-8 at 22-25) Plaintiff reported she felt "sad, empty [and] tearful," and was depressed "most of the day." (*Id.* at 22) She also described having difficulty with concentration, making decisions, relaxing, and sleeping. (*Id.* at 22-23) Ms. Overholt observed that Plaintiff appeared anxious and agitated. (*Id.* at 23) She determined Plaintiff's attention and concentration were "attentive" and her memory, judgment, and insight were "good." (*Id.* at 24)

Dr. Gil Schmidt conducted a comprehensive psychiatric evaluation on October 16, 2011. (Doc. 14-8 at 35) Plaintiff reported she had been taking Paxil and Depokote for depression and panic attacks. (*Id.*) She reported she previously used marijuana and methamphetamine, and drug and alcohol counseling she attended "was not beneficial." (*Id.* at 36) Plaintiff said everything became "too much" because she lost her job as a medical assistant when the physician died, her husband abused her, and her son was diagnosed with Crohn's Disease. (*Id.* at 35-36) She reported she was "arrested at least 15 times with the last in 2009" for drug-related charges, asserting that the police "would just pick on[her]." (*Id.* at 37) When asked to describe her mood "on a scale of 1-10 with 10 feeling the best mood, she identified her mood as a 1." (*Id.* at 8)

Dr. Schmidt observed that Plaintiff's "[m]ood appeared to be mildly depressed," and her "[a]ffect was congruent, spontaneous with moist eyes." (Doc. 14-8 at 38) He noted Plaintiff was "[i]ntensely negative claiming a victim role of so many different things happening just to her." (*Id.*) Dr. Schmidt found Plaintiff's "[l]ong-term, short-term and working memory appeared intact and functional," and her attention and concentration were "[w]ithin normal limits." (*Id.* at 39) When he attempted to evaluate Plaintiff's abstract thinking, Plaintiff "demonstrate[ed] very poor effort" and "appeared to not to want to respond effectively." (*Id.*) Dr. Schmidt explained that despite Plaintiff's lack of effort, "her presentation during the interview process would suggest that her cognitive thinking was intact at the functional level of reasoning." (*Id.*) Further, he explained that Plaintiff "respond[ed] appropriately to conversational bantering demonstrating an adequate range of affective expression and

appropriate social cueing." (*Id.*) Dr. Schmidt concluded Plaintiff did not have any limitations with

following simple instructions or performing simple and repetitive tasks. (*Id.* at 40) Further, Dr. Schmidt

believed Plaintiff did not have any limitations with maintaining attention, accepting instructions from

supervisors, interacting with the public, dealing with stress encountered in the workplace, or

maintaining attendance." (*Id.*)

On January 19, 2012, Dr. Asarulislam Syed at the Oildale Community Health Center evaluated

Plaintiff's mental health. (Doc. 14-8 at 41-42) Plaintiff reported her depression as a "3/10" and

anxiety as "7/10." (*Id.* at 41) She attributed her stress to "dealing with her son's pain, her mother and

the insurance issues in trying to get treatment." (*Id.*) Dr. Syed noted:

> Patient complains of having depressed and irritable mood on most of the days with mood
> changes that are rapid. Mood disturbances have caused a major setback to occupational
> functioning and relationship with others. Patient appears well groomed, is cooperative
> and has a pleasant attitude. Is fully alert and oriented to person, place, and time. Speech
> is of a normal rate and tone. Thought processes are fairly goal directed, interactive and
> show normal spontaneity. No distractibility noted. There is some flight of ideas or
> loosening of associations.

(*Id.*) Dr. Syed believed Plaintiff's memory function and concentration were "good," and she "show[ed]

good sense of judgment." (*Id.*)

On June 28, 2012, Plaintiff went to the emergency room at San Joaquin Community Hospital

("SJCH"), reporting "shortness of breath and chest pain for the past three days without improvement."

(Doc. 14-13 at 15) Doctors there diagnosed her with anxiety and discharged her. (Doc. 14-2 at 18)

She returned to SJCH on July 6, again "complaining of shortness of breath." (*Id.*) Upon examination,

Dr. Kevin Schmidt determined Plaintiff's lungs were "clear to auscultation" and her respiration was

"non-labored," though she had "[m]ild diffuse rhonchi." (*Id.* at 20) An EKG showed a normal rhythm,

and a chest x-ray showed her heart was a normal size. (*Id.* at 20, 21) However, the x-ray also "showed

hyperexpansion lung fields consistent with COPD." (*Id.*) Plaintiff was discharged the same day in

stable condition. (*Id.* at 22)

On August 28, 2012, Plaintiff return to SJCH, describing continuous "chest pain at the

precordial area." (Doc. 14-10 at 4) In the emergency room, she "had some generalized anxiety and

stated [her] chest pain became worse, so [Plaintiff was] admitted to rule out [acute coronary

syndrome]." (*Id.* at 5) Plaintiff reported she had a myocardial infarction the prior month and a history

6

of heart disease.  (*Id.*)  Dr. Nassef Henein noted an EKG was "negative" for an acute myocardial infarction, and chest x-rays were "normal."  (*Id.* at 7, 8)  Similarly, the results of a stress test or "within normal limits" and did not show an infarction.  (Doc. 14-12 at 8)  Dr. Henein discharged Plaintiff with a diagnosis of "[g]eneralized anxiety disorder and depression," and advised her to visit the emergency room for any chest pain.  (Doc. 14-10 at 8)

On December 27, 2012, Plaintiff went to the emergency department at Mercy Hospital for her son to receive treatment, but "[w]hile she was [there] she thought she would also be seen for her chest pain." (Doc. 14-8 at 72)  She reported she had a heart attack in September 2012, and had "chest pain for about a week on and off," which could "last hours at a time."  (*Id.*)  Plaintiff said it hurt to breathe in, and she described the pain as "8/10."  (*Id.*)  Dr. Arthur Fontaine reviewed x-rays of Plaintiff's chest and opined the results were normal.  (*Id.* at 74)

On January 11, 2013, Plaintiff went to SJCH, reporting she had an "increased cough for the last few weeks and on and off for three months." (Doc. 14-9 at 20)  Dr. Henein ordered chest x-rays, which showed Plaintiff's lungs were "grossly clear and hyperinflated."  (Doc. 14-10 at 3)  He determined Plaintiff had "[e]xacerbated chronic obstructive pulmonary disease."  (Doc. 14-9 at 28)  On January 31, Plaintiff returned to SJCH, reporting she had been experiencing shortness of breath for two hours. (*Id.* at 10)  Dr. John Ziomek found Plaintiff had shallow respirations and diminished breathing.  (*Id.* at 12)  Additional x-rays of Plaintiff's chest were ordered, and Dr. Jonathan Perry found "calcified granulomas … in the right upper lobe."  (*Id.* at 19)  Dr. Perry opined her lungs were "otherwise clear" and there was "[n]o acute abnormality."  (*Id.* at 15, 19) Dr. Ziomke concluded Plaintiff had "chronic obstructive pulmonary disease exacerbation with bronchospasm," and she was discharged a few hours later.  (*Id.* at 15)

In April 2013, Plaintiff visited Dr. Syed and complained "of excessive anxiety or worry occurring on most days for more than six months."  (Doc. 14-14 at 45)  "Plaintiff complain[ed] of having easy fatigability, difficulty concentrating, irritability, muscle tension, and sleep disturbance with poor non-restful interrupted sleep."  (*Id.*)  However, Plaintiff reported that taking Valium and Xanax helped her.  (*Id.*)  Dr. Syed observed that Plaintiff's thought processes were "goal-directive, interactive and show normal spontaneity."  (*Id.*)  Dr. Syed noted: "There is no flight of ideas or

loosening of associations.  Thought content reveals no delusion, hallucinations or preoccupation with traumatic flashbacks. There is no evidence of any grandiosity or morbid preoccupation.  Cognition is intact. Memory function is good.  Concentration abilities are good." (*Id.*)  Further, Dr. Syed opined Plaintiff's reasoning, insight, and judgment were "fair." (*Id.* at 46)  He gave Plaintiff a GAF score of 25[2] as of January 2013.  (*Id.*)

Dr. Syed completed a mental capacity assessment on May 20, 2013.  (Doc. 14-14 at 65-67)  He indicated Plaintiff had been diagnosed with "Bipolar Disorder, Generalized Anxiety Disorder, [and] Insomnia." (Doc. 14-14 at 65)  According to Dr. Syed, Plaintiff had "slight" limitations with her ability to understand and remember very short and simple instructions, but "marked" limitations with carrying out either simple or detailed instructions.  (*Id.*)  In addition, he believed Plaintiff had "moderate" limitations with the ability to perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances; sustaining a routine without special supervision; making simple work-related decisions; performing at a consistent pace; completing a normal workday without interruptions from psychologically-based symptoms and getting along with co-workers.  (*Id.* at 65-67)  Dr. Syed believed Plaintiff had "slight" limitations related to interacting with the public, but would have "marked" limitations with "[t]he ability to accept instructions and respond appropriately to criticism from supervisors." (*Id.* at 66)  Dr. Syed concluded Plaintiff had "extreme" limitations with her ability to maintain attention and concentration for extended periods.  (*Id.* at 67)

**B.     Administrative Hearing Testimony**

On July 18, 2013, Plaintiff appeared at the hearing before the ALJ.  (Doc. 14-3 at 45)  She testified she last worked, "I think it was 2006, 2008," as a babysitter for her cousin.  (*Id.* at 46)  Plaintiff estimated that she worked about twelve hours each week taking care of the two children.  (*Id.* at 46-47)

Plaintiff reported she suffered from "depression and anxiety, panic attacks." (Doc. 14-3 at 48)  She explained the symptoms included headaches, "[c]rying, don't want to get out of bed, every day

---

[2] A GAF score between 21-30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR in ability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *DSM-IV* at 34 (emphasis omitted).

like stress." (*Id.*)  Plaintiff said she was "just overwhelmed." (*Id.*)  Plaintiff reported she could not "be around crowds," and she and her son stayed to themselves. (*Id.* at 52)  She said that she would go grocery shopping at times when she could avoid the crowds. (*Id.*)

In addition, Plaintiff said she had panic and anxiety attacks "[m]aybe twice a week" that make her "want to jump out of [her] skin." (Doc. 14-3 at 49)  During a panic attack, Plaintiff said she would "lash out" and scream, "just to try to release some stress," but she did not physically lash out at anyone. (*Id.*)  She attributed the panic attacks and stress to worrying about her son, who she said was twenty years old and "has Crohn's, diverticulitis and pancreatic cancer." (*Id.* at 49-50)  Plaintiff said she was seeing a psychiatrist, Dr. Syed, "every month to every other month" for 45 minutes each visit, and was taking Valium, Xanax, and Zoloft for the depression and anxiety. (*Id.* at 50-51)

She testified that she also had heart problems and COPD. (Doc. 14-3 at 53)  She said her COPD caused coughing and chest pains, and "turned into pneumonia quite a bit." (*Id.*)  Plaintiff testified that she was "not allowed to lift, [and] not allowed to walk very far." (*Id.* at 53-54)  She explained her house was 900 square feet, and she could "walk from the end of [her] house to the back bedroom and be out of breath." (*Id.* at 54)  Further, Plaintiff said she was "not allowed to be in the heat." (*Id.*)  She said that hot temperatures drained her, and took "every bit of energy or every bit of any strength" she had. (*Id.*)

Plaintiff said she tried to provide physical support for her son by making his food, helping with his medication and "if he's having a bad day help in and out of the bathroom." (Doc. 14-3 at 50)  She reported she also performed household chores such as cleaning, vacuuming, and taking care of the house "the best [she] can." (*Id.* at 50-51)  Plaintiff reported that "[a]t least twice out of seven days" she felt unable to do these activities. (*Id.* at 51)

Vocational expert Valerie Williams (the "VE") also testified at the hearing.  The VE classified Plaintiff's past work as a babysitter, which required a medium strength exertional level under the *Dictionary of Occupational Titles.*[3] (Doc. 14-3 at 59)

---

[3] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

1    The ALJ asked the VE to consider "an individual with the claimant's age, education and

2    experience who can perform the full range of light work with occasional for all posturals."  (Doc. 14-3

3    at 60)  In addition, the VE clarified that the hypothetical person "require[d] asthma precautions" and

4    was limited to "simple, repetitive tasks with no more than superficial public interaction."  (*Id.*)  The VE

5    opined such a person would not be able to perform Plaintiff's past work.  (*Id.*)  However, the VE

6    believed the individual could perform other jobs in the state of California and the nation.  (*Id.*)  As

7    examples, the VE identified the following positions: appeal checker, DOT 299.667-014; bench

8    assembler, DOT 706.684-022; routing clerk, DOT 222.687-022.  (*Id.*)

9    **C.     The ALJ's Findings**

10   Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

11   activity after the application date of June 30, 2011.  (Doc. 14-3 at 24)  Second, the ALJ found Plaintiff

12   "has the following severe impairments: affective disorder, anxiety disorder, chronic obstructive

13   pulmonary disorder/asthma, lumbago/chronic pain syndrome."  (*Id.*)  These impairments did not meet

14   or medically equal a listed impairment.  (*Id.* at 25)  Next, the ALJ determined:

15   [T]he claimant has the residual functional capacity to perform light work as defined in
16   20 CFR 416.967(b) except she may only occasionally kneel, crouch, crawl or stoop,
     must work in an environment that does not aggravate her asthma, and is limited to
17   simple and repetitive tasks with no more than superficial public interaction.

18   (*Id.* at 26)  With this residual functional capacity, the ALJ determined "there are jobs that exist in

19   significant numbers in the national economy that the claimant can perform."  (*Id.* at 29)  Therefore, the

20   ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 30)

21                              **DISCUSSION AND ANALYSIS**

22   Appealing the ALJ's decision, Plaintiff asserts the ALJ failed to properly evaluate the medical

23   evidence and define her residual functional capacity.  (Doc. 17 at 12-20)  In addition, Plaintiff argues

24   that the ALJ erred in rejecting the credibility of her subjective complaints.  (*Id.* at 20-21)  Accordingly,

25   Plaintiff concludes the ALJ also erred in relying upon the testimony of the vocational expert to

26   conclude that she able to perform work in the local and national economy.  (*Id.* at 22-23)

27   **A.     The ALJ's Credibility Determination**

28   When evaluating a claimant's credibility, an ALJ must determine first whether objective

10

medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Next, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility. *Id.* at 1036.  Here, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 14-3 at 27)  However, the ALJ opined Plaintiff's "statements concerning the intensity, persistence and limiting effects of the[] symptoms are not entirely credible." (*Id.*)

An ALJ must base an adverse credibility determination on clear and convincing evidence where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).  Factors the ALJ may consider include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).  To support an adverse credibility determination, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).

In this case, the ALJ considered inconsistencies between Plaintiff's statements and the record, the treatment she sought, and the objective medical evidence. (*See* Doc. 9-3 at 25-26)  The Ninth Circuit has determined these may be relevant factors in assessing the credibility of a claimant. *See Fair*, 885 F.2d at 603; *Thomas*, 278 F.3d at 958-59.

### 1.      Treatment received

When assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. §§ 404.1529(c), 416.929(c).  Further, the treatment Plaintiff received, especially when conservative, is a legitimate consideration in a credibility finding. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (the ALJ properly considered the physician's

failure to prescribe, and the claimant's failure to request, medical treatment commensurate with the "supposedly excruciating pain" alleged).

Here, the ALJ observed that Plaintiff's treatment for chest pain—attributed to anxiety— "has been irregular and what records there are, do not indicate impairment of the severity alleged by the claimant."  (Doc. 14-3 at 27)  Because Plaintiff did not seek regular treatment for anxiety, and the treatment received was conservative, this factor supports the adverse credibility determination.

> 2.      Conflicts with the medical record

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility."  *Morgan v. Comm'r of Social Sec. Admin*., 169 F.3d 595, 600 (9th Cir. 1999).  The Ninth Circuit explained, "testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but "the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."  *Rollins*, 261 F.3d at 857. Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination").  Rather, an ALJ must "identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ "must state which . . . testimony is not credible and what evidence suggests the complaints are not credible").

In this case, the ALJ noted, "[a]lthough the claimant reported in her medical record that she had a heart attack in either January 2013 or December 2012, there are no records reflective of that episode." (Doc. 14-3 at 24)  The ALJ observed that despite Plaintiff's allegations of "several heart attacks in 2002, medical records of those events are not present," and "no evidence of ischemia has been found." (*Id.*)  In addition, though Plaintiff reported she saw Dr. Syed monthly since 2011, the ALJ found only

1  two substantive treatment notes from him.  (*Id.* at 27-28)

2        Further, the ALJ determined the record indicated Plaintiff's "functioning was generally intact,"

3  even when she "was symptomatic of anxiety and depression."  (Doc. 14-3 at 27)  For example, the ALJ

4  noted that even when Plaintiff had "some flight of ideas," Dr. Syed found "her cognition was 'intact,'

5  her memory was 'good,' and her concentration 'good.'"  (*Id.* at 27)

6        Because the ALJ carried his burden to identify evidence in the record that undermined the

7  credibility of Plaintiff's assertions, the objective medical record supports the adverse credibility

8  determination. *See Greger*, 464 F.3d at 972; *see also Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir.

9  1995) (an ALJ may consider "contradictions between claimant's testimony and the relevant medical

10  evidence").

11  **B.        Evaluation of Dr. Syed's Opinion**

12        In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating

13  physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-

14  examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830

15  (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the greatest weight but it is

16  not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes*

17  *v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more

18  weight than the opinion of non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.

19  1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

20        A physician's opinion is not binding upon the ALJ, and may be discounted whether or not

21  another physician contradicts the opinion.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an

22  *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and

23  convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or

24  examining professional may be rejected for "specific and legitimate reasons that are supported by

25  substantial evidence in the record."  *Id.*, 81 F.3d at 830.  When there is conflicting medical evidence, "it

26  is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577,

27  579 (9th Cir. 1984).  The ALJ's resolution of the conflict must be upheld by the Court when there is

28  "more than one rational interpretation of the evidence."  *Id.; see also Matney v. Sullivan*, 981 F.2d

1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the

evidence, and if the evidence can support either outcome, the court may not substitute its judgment for

that of the ALJ").  Here, Plaintiff contends the ALJ erred in evaluating the opinions of the treating

physician, Dr. Syed.  (Doc. 15 at 12-16)  Because the limitations Dr. Syed assessed were contradicted

by Drs. Aleshire and Schmidt, the ALJ was required to identify specific and legitimate reasons for

rejecting Dr. Syed's opinions.

   The ALJ indicated she did not give significant weight to the opinion of Dr. Syed, who "opined

the claimant is markedly or extremely impaired in several categories of functioning, including the

ability to maintain concentration and pace, and respond appropriately to criticism."  (Doc. 14-3 at 27)

The ALJ determined the opinions were inconsistent with his treatment notes and "with the claimant's

record as a whole."  (*Id.* at 27-28)  The Ninth Circuit has determined these may constitute specific and

legitimate reasons for giving less weight to the opinions of treating physicians.  *See, e.g., Batson v.*

*Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003); *Tommasetti v. Astrue*, 533 F.3d

1035, 1041 (9th Cir. 2008).

   1.   Inconsistencies with Dr. Ahmed's treatment notes

   The Ninth Circuit explained the opinion of a treating physician may be rejected where an ALJ

finds incongruity between a treating doctor's assessment and his own medical records, and the ALJ

explains why the opinion "did not mesh with [his] objective data or history."  *Tommasetti*, 533 F.3d at

1041; *see also Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion

properly rejected where the treating physician's treatment notes "provide no basis for the functional

restrictions he opined should be imposed on [the claimant]"); *Morgan v. Comm'r of the Soc. Sec.*

*Admin.*, 169 F.3d 595, 603 (9th Cir. 1999) (explaining inconsistencies supports the decision to discount

the opinion of a physician).

   Here, the ALJ observed, "Dr. Syed's scant records, the foundation upon which his opinion must

rest, are inconsistent and confusing."  (Doc. 14-3 at 27)  For example, the ALJ noted, "Dr. Syed

assigned the claimant a global assessment of functioning (GAF) score of 25, indicative of a claimant

with an inability to function in all areas of functioning, considerably influenced by delusions or

hallucinations, or seriously impaired in judgment or communication."  (*Id.*)  However, the ALJ

observed also that "[i]n the same treatment notes for the same day… Dr. Syed notes that the claimant's speech was 'appropriate,' her behavior was 'unremarkable,' that her thought processes were 'logical' and her thought content 'unremarkable.'" (*Id.*)

Because the ALJ met his burden to identify inconsistencies with Dr. Syed's conclusions and the treatment notes related to Plaintiff's thought content and ability to concentrate, the inconsistencies support the ALJ's decision to give less weight to the conclusions of Dr. Syed.

2.      Inconsistencies with the medical record as a whole

The Ninth Circuit has determined that inconsistency with the overall record constitutes a legitimate reason for discounting a physician's opinion. *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 602-03 (9th Cir. 1999). However, to reject an opinion as inconsistent with the medical record, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Embrey*, 849 F.2d at 421-22.

Here, the ALJ found Dr. Syed's opinion was "not consistent with the record as a whole." (Doc. 14-3 at 28) The ALJ explained, "[b]eyond a prescription for Seroquel and Valium, Dr. Syed ordered no further intervention." (*Id.*) Also, the ALJ observed that Dr. Aleshire evaluated Plaintiff and found she was able to perform simple and repetitive tasks, though "her symptomology does have a daily, distracting effect upon her life and her ability to perform workplace functions." (*Id.*) Because the ALJ met his burden to identify evidence in the record—including Dr. Syed's own notes and the conflicting opinion of Dr. Aleshire—the objective medical evidence supports the ALJ's decision to give less than controlling weight to the opinion. *See Morgan*, 169 F.3d at 602-03; *Tommasetti*, 533 F.3d at 1041.

3.      Substantial evidence supports the ALJ's decision

When an ALJ rejects contradicted opinions of physicians, the ALJ must not only identify specific and legitimate reasons for rejecting those opinions, but the decision must also be "supported by substantial evidence in the record." *Lester*, 81 F.3d at 830. The ALJ articulated specific and legitimate reasons for rejecting the opinion of Dr. Syed. However, the decision still must be supported by substantial evidence in the record.

1    The term "substantial evidence" "describes a quality of evidence ... intended to indicate that the

2    evidence that is inconsistent with the opinion need not prove by a preponderance that the opinion is

3    wrong." SSR 96-2p, 1996 SSR LEXIS 9 at *8[4]. "It need only be such relevant evidence as a

4    reasonable mind would accept as adequate to support a conclusion that is contrary to the conclusion

5    expressed in the medical opinion." *Id.*

6    Here, the ALJ gave "significant weight" to the opinion of Dr. Aleshire, who administered a

7    comprehensive psychiatric evaluation, in determining Plaintiff's residual functional capacity. (Doc.

8    14-3 at 28) When the opinions of a physician "rest[] on independent examination," the opinions

9    constitute substantial evidence. *Tonapetyan*, 242 F.3d at 1149; *see also Orn v. Astrue*, 495 F.3d 625,

10   632 (9th Cir. 2007) (when an examining physician provides independent clinical findings, such

11   findings are substantial evidence). As noted by the ALJ, Dr. Aleshire believed Plaintiff's

12   "symptomology does have a daily, distracting effect upon her life and her ability to perform workplace

13   functions." (*Id.*) Nevertheless, Dr. Aleshire concluded Plaintiff was able to perform "simple and

14   repetitive tasks," and the ALJ adopted this conclusion. (*Id.*; *see also* Doc. 14-8 at 6) Because these

15   opinions were based upon Dr. Aleshire's examination, his findings are substantial evidence supporting

16   the residual functional capacity.[5]

17   **C.     Limitation to "Simple Repetitive Tasks" and Social Functioning**

18   Plaintiff contends the ALJ erred in her residual functional capacity because "the ALJ did not

19   mention the social limitations Dr. Aleshire opined, nor did she explain why she did not also adopt those

20   limitations." (Doc. 17 at 12) Plaintiff acknowledged that the ALJ indicated she gave testimony

21   regarding social functioning "the benefit of the doubt" and found "that she should work in an

22   environment with only superficial interaction with others." (*Id.* at 12-13 quoting Doc. 14-3 at 29)

23   Plaintiff contends that "this finding does not limit [her] social abilities to the same extent as Dr.

24

25   _____

     [4] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations"
     issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). Although they do not have the force of law, the Ninth Circuit gives
26   the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882
     F.2d 1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006) ("SSRs reflect the
27   official interpretation of the [SSA] and are entitled to 'some deference' as long as they are consistent with the Social
     Security Act and regulations").
     [5] Significantly, the conclusion that Plaintiff is able to perform simple and repetitive tasks is also supported by the
28   opinion of another examining physician, Dr. Schmidt, who concluded Plaintiff did not have any limitations with following
     simple instructions or performing simple and repetitive tasks. (Doc. 14-8 at 40)

                                                        16

1    Aleshire did and the ALJ failed to provide any reasoning as to why her lay opinion should be accepted

2    over Dr. Aleshire's opinion." (*Id.*)

3            Significantly, however, the ALJ did not impose her lay opinion on the residual functional

4    capacity as Plaintiff argues, but incorporated the opinions of Dr. Aleshire in the limitation to "simple

5    and repetitive tasks with no more than superficial public interaction."  (*See* Doc. 14-3 at 26)

6    Specifically, Dr. Aleshire determined Plaintiff had "a moderately impaired ability to accept instructions

7    from supervisors, interact with coworkers and the public."  (Doc. 14-8 at 4) He also gave her a GAF

8    score of 54, thereby indicating Plaintiff had "*moderate* symptoms (e.g., flat affect and circumstantial

9    speech, occasional panic attacks) OR *moderate* difficulty in social, occupational, or school

10   functioning."  (*DSM-IV* at 34, emphasis added)

11           The Ninth Circuit has determined the limitation to unskilled work adequately encompasses a

12   claimant's "moderate mental residual functional capacity limitations."  *See, e.g., Thomas*, 278 F.3d at

13   953, 955; *see also Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008) (concluding the limitation

14   to "simple, routine, repetitive" tasks accommodated the examining physician's findings that the

15   claimant had "several moderate limitations")  Likewise, the Ninth Circuit concluded a limitation to

16   simple tasks adequately encompasses moderate limitations with social functioning.  *See Rogers v.*

17   *Comm'r of Soc. Sec. Admin.,* 490 Fed. App'x. 15 (9th Cir. 2012) (holding that a residual functional

18   capacity for simple routine tasks, which did not expressly note the claimant's moderate limitations in

19   interacting with others, nonetheless adequately accounted for such limitations); *see also Langford v.*

20   *Astrue*, 2008 WL 2073951 at *7 (E.D. Cal. May 14, 2008) ("unskilled work . . . accommodated [the

21   claimant's] need for 'limited contact with others'").

22           Notably, simple and unskilled jobs "ordinarily involve primarily dealing with objects, rather

23   than with data or people).  SSR 85-15, 1985 SSR LEXIS 20.[6]  Indeed, the *Dictionary of Occupational*

24   *Titles* explains the interaction with people is "not significant" for positions identified by the ALJ.  *See,*

25   *e.g.*, DOT 299.667-014, 1991 WL 672642 (apparel checker); DOT 706.684-022, 1991 WL 679060

26

27           [6] Social Security Rulings (SSR) are "final opinions and orders and statements of policy and interpretations" issued
     by the Commissioner.  20 C.F.R. § 402.35(b)(1).  While SSRs do not have the force of law, the Ninth Circuit gives the

28   rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d
     1453, 1457 (9th Cir. 1989); *see also Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006).

(bench assembler); DOT 222.687-022, 1991 WL 672133 (routing clerk).

Consequently, although Plaintiff contends the ALJ rejected the social functioning limitations from the opinion of Dr. Aleshire, the restriction to "simple and repetitive tasks" encompasses Plaintiff's moderate limitations.

**D.      Plaintiff's Environmental Limitations**

In the residual functional capacity, the ALJ limited Plaintiff to "work in an environment that does not aggravate her asthma."  (Doc. 14-3 at 26)  Plaintiff contends "this vague limitation" is not sufficient, because it "provides no indication of the types of environmental factors [she] must avoid or the extent, if any, to which she can be exposed to environmental factors such as dust, fumes, or odors." (*Id.* at 15-6)

As noted by Plaintiff, environmental factors a person may need to "avoid because of an impairment include those involving extremes of temperature, noise, and vibration…and fumes, dust, and poor ventilation."  SSR 85-15, 1985 SSR LEXIS 20 at *21-22.  Here, after the ALJ asked the VE to identify jobs with "asthma precautions," (s*ee* Doc. 14-3 at 60) the VE identified jobs with environments that did not include exposure to extreme cold, extreme heat, wet and/or humid conditions, or other environmental irritants.  *See* DOT 299.667-014, 1991 WL 672642 (apparel checker); DOT 706.684-022, 1991 WL 679060 (bench assembler); DOT 222.687-022, 1991 WL 672133 (routing clerk).  Further, these jobs do not require exposure to dust, gases, or fumes.  Rather, for each of these positions, the *Dictionary of Occupational Titles* indicates the environmental conditions "do[] not exist."  *Id.*

Consequently, though the ALJ did not "quantify" the level of environmental limitations, the VE identified jobs that would not expose Plaintiff to *any* environmental irritants related to her asthma and COPD.  Thus, any error by the ALJ in setting forth the extent of Plaintiff's environmental limitations is harmless.  *See Stout v. Comm'r, Soc. Sec. Admin*., 454 F.3d 1050, 1055 (finding an error harmless where the error is "inconsequential to the ultimate nondisability determination").

**E.      Reliance upon the Vocational Expert's Testimony**

Plaintiff contends the ALJ erred by relying upon the testimony of the vocational expert to determine that she is not disabled at step five of the sequential evaluation.  (Doc. 17 at 22-23) At step five, the burden shifts to the Commissioner to show that Plaintiff can perform other substantial gainful

activity and a "significant number of jobs exist in the national economy" which Plaintiff can perform. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984); *see also Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001) (discussing the burden shift at step five). To make this determination, the ALJ may call a vocational expert "to testify as to (1) what jobs the claimant, given his or her functional capacity, would be able to do; and (2) the availability of such jobs in the national economy." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).

When eliciting testimony from a vocational expert, the ALJ must set forth "hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational expert's consideration." *Tackett*, 180 F.3d at 1101 (quoting *Gamer v. Sec'y of Health & Human Servs.*, 815 F.2d 1275, 1279 (9th Cir. 1987)).  Only limitations supported by substantial evidence must be included. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2006); *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001).  "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that the claimant has a residual working capacity has no evidentiary value." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).  When the "weight of the medical evidence supports the hypothetical questions posed," the ALJ's findings will be upheld by the court.  *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1987); *see also Gallant*, 753 F.2d at 1456.

Plaintiff asserts the ALJ erred in relying upon the VE's testimony because the "the ALJ failed to provide a detailed limitation for [her] respiratory impairments."  (Doc. 15 at 21)  In addition, Plaintiff asserts the ALJ "failed to incorporate the full extent of the social limitations" assessed by Dr. Aleshire.  (*Id.*)  However, as discussed above, the moderate social limitations are incorporated within the RFC of "simple and repetitive tasks," and the VE identified jobs that did not include any environmental irritants.  Consequently, the VE's testimony is substantial evidence in support of the ALJ's conclusion that Plaintiff is able to perform work in the national economy, including the jobs of apparel checker, bench assembler, and routing clerk.

## CONCLUSION AND ORDER

For the reasons set for above, the Court finds the ALJ applied the proper legal standards and is supported by substantial evidence in the record.  Therefore, the Court must uphold the conclusion that Plaintiff was not disabled as defined by the Social Security Act.  *Sanchez*, 812 F.2d at 510.

19

Accordingly, **IT IS HEREBY ORDERED**:

1.     The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.     The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Theresa Marie Brassfield.


IT IS SO ORDERED.

Dated:   __**March 23, 2016**__                    _____**/s/ Jennifer L. Thurston**
                                                   UNITED STATES MAGISTRATE JUDGE

20